1~u



# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

March 20, 1939

Honorable Bascom Giles
Land Commissioner
Austin, Texas

Dear Mr. Giles:

Opinion No. 0-453
Re: House Bill No. 373, 46th
Legislature - withdrawal
of land from sale

This Department acknowledges receipt of your
letter of the 4th inst., reading as follows:

"House Bill No. 373, which was passed with the
emergency clause by the present Legislature and
signed by the Governor on February 7, 1939, with-
draws from sale or lease from its effective date
until after the expiration of 90 days from adjourn-
ment of the regular sessionof this Legislature,
all public free school lands heretofore authorized
by any law of this State to be sold or leased.

"This Office has had presented for filing
since February 7, 1939, numerous applications
for survey with field notes made thereunder for
the purchase (and in some cases for mineral
lease) of supposed unsurveyed school land by
virtue of Section 6 (or Section 8), Chapter 271,
Acts 42nd Legislature, passed May 29, 1931.

_ Art 5421c

"By the terms of Section 2 of House Bill 373,
said withdrawal Act does not apply to such appli-
cations and to field notes as were filed in the
Land Office prior to February 7, 1939, but in con-
sidering the tenders for filing made since said
date several questions are presented upon which I
would appreciate the benefit of your construction

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

of the withdrawal Act and your opinion as to its
effect upon the operation of thepresent vacancy
sales law (Chapter 271) under which said filings
were commenced, as follows:

"1. Whether or not said withdrawal Act,
during its effective period, precludes the filing
in this Department for any purpose of any and all
applications for survey and field notes to purchase   *Noy*
or lease supposed vacant tracts. If, in your
opinion, this question would be answered in the
affirmative, then the remaining questions herein
are not necessary to be considered; but if negative,
then:

"2. Where application for survey was filed
with the county surveyor and the survey made be-
fore February 7, 1939, and the papers with proper   *yea*
filing fee were received in the Land Office after
said date but within the prescribed 120 days from
the original filing date, should said papers be
filed in the Land Office?

"3. Where the application for survey was
filed with the county surveyor before, but the   *yea*
survey made after February 7, 1939, and the papers
with fee were received in the Land Office after
said date and within the 120 days from original
file date, should they be filed in the Land
Office for any purpose?

"4. If, under either of the above conditions,
your opinion should be that the applicant could have
fixed a legal right to take the further steps pre-
scribed in the present vacancy law regardless of
the passage of the withdrawal Act, and such appli-
cant's original filing with the county surveyor
was made less than 120 days prior to February 7, 1939,
but no filing was made by him in the Land Office with-
in the 120 days, would such right of the applicant
to proceed expire at the end of said 120-day period
or would the withdrawal Act which became effective dur-
ing the 120-day period in anywise operate to prolong
the existence of such right or to hold same in
suspension after the 120 days expired?"

The Act mentioned in your letter, House Bill No. 373,
reads as follows:

"Section1. That all of the public free

school lands heretofore authorized by any law of this State to be sold or leased, are hereby withdrawn from sale or lease from the effective date of this Act until after the expiration of ninety (90) days from the adjournment of the Regular Session of this Legislature.

"Sec. 2. The withdrawal of said public free school lands from sale or lease shall not apply, however, to applications to purchase or lease filed with the Commissioner of the General Land Office prior to the effective date of this Act or to applications involved in litigation now pending.

"Sec. 3. All laws and parts of laws in conflict with this Act are hereby suspended until after the expiration of ninety(90) days after the adjournment of the Regular Session of this Legislature."

That part of the above mentioned Act hereinafter referred to as the 1939 Act, which it is necessary for us to construe in order to answer the questions propounded by you, is Section 2 above quoted.

You state that the applications which have been presented to you for filing since February 7, 1939, are for supposed unsurveyed school land under Sections 6 and 8, Chapter 271 of the Acts of the 42nd Legislature, 1931, hereinafter referred to as the 1931 Act (Vernon's Article 5421c). Sections 6 and 8 of the 1931 Act will hereinafter be merely referred to as Section 6 and Section 8. This, then, leaves us to consider only the effect of Section 2 of the 1939 Act on applications filed under Sections 6 and 8 of the 1931 Act, which sections involve only unsurveyed school land.

The lands withdrawn from sale or lease under Section 1 of the 1939 Act are "public free school lands". Section 2 of that Act exempts from withdrawal only those lands on which applications to purchase or lease have been filed with the Land Commissioner prior to the effective date of the Act, or to applications involved in litigation now pending. The Act does not make any distinction between surveyed and unsurveyed lands. Under the present laws, or the laws in existence at the time of the passage of the 1939 Act, there are no statutory provisions for filing with the Land Commissioner an application to purchase or lease unsurveyed school lands. As a matter of practice,

123

Hon. Bascom Giles, March 20, 1939, Page 4

the applications filed with the county surveyor under Sections 6 and8 are usually returned to the Land Office with the field notes, but we know of no authority requiring this to be done. It is also true, as a matter of practise, that the Land Commissioner requires the applicant for the purchase of unsurveyed land to file a formal application after the field notes are approved and the land has been valued, and classified. This is the procedure provided for under Article 5325 (now repealed), but the present statutes do not require such procedure. Also, we do not believe that such applications are the applications intended by the 1939 Act. In compliance with Article 5300, the field notes returned by the surveyor also state that the survey is made by the authority of a certain application filed with the surbeyor. It is also to be noticed that the applications filed with the county surveyor under Sections 6 and 8 always state that they are applications for a survey with a view to purchase the land or with a view to purchase a mineral lease. The filing of an application for a survey constitutes the first step to be taken by one desiring to purchase land under Section 6 or to secure a preference right to puschase a mineral lease under Section 8.

It occurs to us that the Legislature, or at least the author of the bill, probably had in mind that all applications of those desiring to purchase or lease school lands, whether surveyed or unsurveyed, are filed in the Land Office, as no provision inthe bill or emergency clause shows that it was the intention of the Legislature to make any distinction between surveyed and unsurveyed land. In other words, it appears that the Legislature intended that the 1939 Act should not apply to applications which had been legally and duly filed with the proper authority. In speaking of applications filed with the Land Commissioner, with whom they must be filed for the purchase of surveyed school lan land, we believe that the Legislature meant that the Act should not apply to applications which had been legally and properly filed for the purchase or lease of school lands, and it was not intended that the Act should affect such applications.

If we should make this construction of the 1939 Act, we will merely be following the well known principle of statutory construction, that statutes should, if possible, be construed so as to uphold their constitutionality. At the time of the enactment of the 1939 Act, and particularly Section 2 thereof, the Legislature evidently knew that applications might be on file for the purchase or lease of lands which could not be affected by any act it might pass, and it was intended to show that it was not the purpose of the Legislature to deprive any person of any right

Hon. Bascom Giles, March 20, 1939, Page 5

that might have accrued by virtue of an application to purchase or lease lands, whether surveyed or unsurveyed. Therefore, we believe that Section 2 of the 1939 Act can be construed as if the words, "with the Commissioner of the General Land Office" were not therein, and thereby uphold the validity of the Act.

If, however, we are mistaken in the above construction of the 1939 Act and Section 2 of same it to be construed as not applying to applications filed with the County Surveyor for surveys with the view of purchasing or leasing unsurveyed school lands as provided in Sections 6 and 8, unless said applications have been filed with the Land Commissioner prior to February 7, 1939, the effective date of the Act, then the question arises as to whether said Section 2 of the 1939 Act is valid as withdrawing from sale or lease lands on which applications have been filed with the county surveyor under Sections 6 and 8 before the enactment of the 1939 Act, but which applications had not been filed with the Land Commissioner before that date)

It is well settled that if at the time of the passage and effective date of the 1939 Act any applicant had secured a vested right to purchase or lease lands under Sections 6 and 8, any act of the Legislature in seeking to deprive those applicants of their vested rights secured is of no effect. White v. Martin, 66 Tex. 340; 17 S. W. 727; Jumbo Cattle Co. v. Bacon, 79 Tex. 5, 14 S. W. 840.

It is also well settled that if the laws of Texas have made an offer to sell or lease lands to any person, which offer has been accepted by some person, the withdrawal of the offer to sell or lease after the acceptance of the offer is of no effect. State v. Robinson, 119 Tex. 302, 30 S. W. (2d) 292.

This, then, leaves us to decide (1) whether a vested right to purchase or lease lands under Sections 6 or 8 was secured, or the State's offer to sell or lease was accepted, upon the filing of the application with the County Surveyor as provided in said two sections, or (2) whether the vested right to purchase or lease, or the offer to sell or lease had been accepted, only when the application was filed with the Land Commissioner. If the vested right to purchase or lease was secured, or the acceptance of the offer to purchase or lease was made, at the time of the filing of the application with the County Surveyor, then the provisions of the 1939 Act withdrawing the land from sale or lease is ineffective as to applications filed with the County Surveyor before the effective date of the Act

Hon. Bascom Giles, March 20, 1939, Page 6

regardless of the construction placed upon Section 2 of said Act.

Section 6 of the 1931 Act (Vernon's Article 5421c) provides, in part, as follows:

"Anyone desiring to buy any of the unsurveyed land included in this Act not situated within five miles of a producing oil or gas well shall file with the county surveyor of the county in which the land may be situated, an application for survey describing the land in such manner as will enable the surveyor to identify it and pay the surveyor a fee of One Dollar ($1.00) for filing and recording said application and also deposit with him such sum of money as will pay for citing the claimant or claimants of the land, if any, and the adjoining owners as the tax rolls may disclose the names of such claimants or adjoining owners. The surveyor using the forms prescribed by the General Land Office, shall immediately send by registered mail or hand to each claimant or adjoining owner a citation containing a description of the land sought to be surveyed and fix a date for survey. The survey shall be made and the field notes filed in the Land Office within one hundred and twenty (120) days from the filing of the application with the surveyor. If the area is found by the Commissioner to be unsurveyed and subject to sale, he shall value the land and give notice of the valuation to the applicant who may purchase the land on the same terms and conditions as prescribed by the law and the regulations for the sale of surveyed land; provided, if the area should be in the enclosure of another person claiming it in good faith, or occupied as a home by another, such holder or occupant shall have a preference right for a period of sixty (60) days after service of citation to have the land surveyed on his own application to the surveyor and on the return of the sum advanced by the first applicant for citation, and thereupon fix his right to purchase as herein provided."

Section 8 of the same Act contains the following provisions

"Any person who discovers an unsurveyed area of school land which has not been listed on the records of the Land Office as school land, and is not in actual conflict on the ground with land previously

Hon. Bascom Giles, March 20, 1939, Page 7

sold or appropriated and which appears on the official Land Office map as unsurveyed land, may apply in writing to the county surveyor and have the same surveyed, and after the field notes have been returned to the Land Office and approved and filed with the Land Commissioner, shall have a preference right for sixty (60) days thereafter to purchase a mineral lease thereon at the minimum price fixed by the Land Commissioner, in addition to the other consideration provided herein."

We again call attention to the fact that under the above statutes, applications to purchase or lease unsurveyed school lands are filed with the County Surveyor and not with the Land Commissioner.

In White v. Martin, 66 Tex. 340, 17 S. W. 727, the Court had under consideration the sales Act of 1879 (Ch. 52 p. 48, Acts of the Regular Session of the 16th Legislature). Sections 2 to 5 inclusive of that Act reads as follows:

"Sec. 2. That any person, firm or corporation, desiring to purchase any of the unappropriated lands herein set apart and reserved for sale, may do so by causing the tract or tracts which such person, firm or corporation desire to purchase to be surveyed by the authorized public surveyor of the county or district in which said land is situated.

"Sec. 3. It shall be the duty of the surveyor, to whom application is made by reasonable parties, to survey the lands designated in said application within three months from the date thereof, and within sixty days after said survey, to certify to, record and map the field-notes of said survey; and he shall also, within the said sixty days, return to and file the same in th general land office, as required by law in other cases.

"Sec. 4. Surveyors shall be entitled to receive from applicants for the purchase of lands under the authority of this act all legal surveyor's fees for work done by them.

"Sec. 5. Within sixty days after the return to and filing in the general land office of the surveyor's certificate, map and field notes of the land desired to be purchased, it shall be the

right of the person, firm or corporation who
has had the same surveyed to pay or cause to be
paid into the treasury of thestate the purchase
money therefor at the rate of fifty cents per
acre, and upon the presentation to the com-
missioner of the general land office of the re-
receipt of the state treasurer for such purchase
money, said commissioner shall issue to said
person, firm or corporation a patent for the
tract or tracts of land so surveyed and paid for."

A subsequent Act of 1883 withdrew all school
lands from sale. The question of the effect of this with-
drawal on pending applications to purchase was considered
by the Court, which states that the very filing of an
application with the county surveyor conferred no abso-
lute right to have the survey made, for it was only when
such applications were made by responsible parties that
the law made it the duty of the surveyor to make such
surveys, and further held that the surveyor was the judge
of whether the applicant was a responsible person. It is
to be noted from the Act of 1879 above quoted that section
2 provides that any person "desiring to purchase" may do
so by "causing the land to be surveyed" by an authorized
public surveyor and Section 3 provides that it is the duty
of the surveyor, when applications are made by "responsible
parties", to survey the land, and further provides that
the field notes shall be returned to the Land Office within
60 days after the survey.

It is to be noticed that Sections 6 and 8 of the
1931 Act contain no provision authorizing the county sur-
veyor to pass upon the responsibility of the applicants.
In fact, the Act says nothing about responsible parties.
On the contrary, Section 6 provides that immediately after
the filing of the application, the surveyor shall serve
citation to each claimant or adjoining owner of the land
described in the application. Section 8, which pertains
to a lease by a discoverer of an unsurveyed area, provides
that the discoverer may have the same surveyed after filing
an application.

In construing the Act of 1879, and deciding when
the right to purchase under said Act becomes vested in the
applicant, the Court in White v. Martin, supra, after stating
that under said Act the mer filing of the application did
not give the applicant a vested right to purchase the land,
for the reason that the Act specifically stated that it may
be purchased "by causing the tract to be surveyed", used this
language:

"How may the applicant become a purchaser?
The statute answers the question 'He may do so by
causing the tract or tracts which such person,
firm or corporation desires to purchase to be
surveyed'. When this is done as the act contem-
plates, then, and not before, the state contracts,
upon the purchaser's complying with the other re-
quirements of the act, that it will convey to him
the land surveyed. When this point was reached,
there existed an executory contract which gave the
purchaser a vested right, upon complying with his
part of the contract, to have the land purchased,
of which subsequent legislation cannot deprive
him.

"On the faith of the state's promise, the
applicant, in good faith, expends money tohave
the land surveyed or incurs obligation to pay.
The eight section of the act provides that 'after
the survey of any of the public domain authorized
by this act, it shall not be lawful for any person
to file or locate upon the land so surveyed, and
such file or location shall be utterly null and
void.' Thus it further evidenced that intention
of the legislature that no right should be deemed
to vest in an applicant prior to a survey; prior
to which time it might be appropriated by a pre-
emptor, or by any responsible person, without in-
fringing any vested right of a former applicant.

"The survey was made for the appellees within
the time prescribed by law, and thus was vested his
right. The field notes were returned to the general
land office within the time required by law, as was
the full price for the land paid to the treasurer
of the state.

"The law, at the time the right vested, declared
'that it shall be the right of the person, firm, or
corporation, who has had the same surveyed, to pay,
or cause to be paid, into the treasury of the state,
the purchase money therefor, at the rate of fifty
cents per acre, and upon the presentation to the
commissioner of the general land office of the re-
ceipt of the state treasurer for such purchase
money, said commissioner shall issue to said per-
son, firm or corporation a patent for the tract or
tracts of land so surveyed and paid for."

"The ninth section declares that if the appli-
cant fails, refuses or neglects to pay for the land

Hon. Bascom Giles, March 20, 1939, Page 10

within the time prescribed, 'he shall forfeit all right thereto.'

"A right cannot be forfeited before it exists, hence we have the clear declaration in the statute that it is not the payment of the purchase money which vests the right to have the land, but that the right vests in the person who has had the survey made, which, however, may be lost by failure to comply with the other terms required of him. The right of the appellees under the facts must stand as though the act of January 22, 1883, had not been passed."

In Bacon v. State, 21 SW 149 (Writ of Error Refused) the Court also construed the Act of 1879 through this language:

"We are of the opinion that the first conclusion of law by the court below - that Bacon and Graves were not responsible parties at the time they applied to purchase this land, and could not purchase under the law - cannot be sustained. We incline to the opinion that the question of responsiblility, within the meaning of the act of 1879, was for the surveyor to decide; and if he held them responsible parties, and made the survey, this would be sufficient to hold the land until the expiration of the time allowed the purchaser in which to make payment."

We see from the above that the Supreme Court of Texas clearly holds that when the applicant takes the initial step to purchase land, his right becomes vested. Under the Act of 1879, the initial step was not taken until the survey was made, and the fact that the field notes had not been filed in the General Land Office did not affect the vested right secured by the initial step of having a survey made.

Under Sections 6 and 8 of the 1931 Act, the initial step is the filing of the application with the county surveyor and the applicant then receives the right to take each successive step in purchasing or leasing the land. Under Section 6 it is required that the field notes be returned to the Land Office within 120 days. Under Section 8 there is no time limit mentioned for the return of the field notes, but from your letter you assume that Section 8, as well as Section 6, authorizes the return of field notes within 120 days; thereby following the opinion of this Department several years ago that if the field notes are returned within 120 days under Section 8, they are returned within sufficient time, but

which opinion did not pass upon the question of whether the field notes may be returned after 120 days from the date of the application.  See also DeGrazier v. Panell Oil Corporation, 109 S. W. (2d) 1109 (Writs of Error refused.)

In White v. Martin, supra, the Court did not require the field notes to be returned to the Land Office in order to secure a vested right to purchase, but merely held that the initial step in securing a vested right to purchase was by having the survey made.  In other words, the Court in that case held that the initial step was sufficient to secure the right to purchase and it is clear that the initial step under Sections 6 and 8 is the filing of the application with the county surveyor.

In Jumbo Cattle Co. v. Bacon, 79 Tex. 5, 14 S. W. 840, the Court held that the Act of 1883 repealing the Act of 1879 pending on application made in accordance with law and followed by a survey would not affect the rights of the purchaser to go on with his purchase and acquire the land under the repealed law.  The land was surveyed under the 1879 Act, only two days before the withdrawal Act was passed.  The decision does not give the date of filing the field notes in the Land Office but says that the field notes were returned to the Land Office within the time prescribed by law, which is 60 days from the date of the survey.  The Court states that however improbably it may be that the vast quantity of land (17,280 acres) could have been surveyed into sections of 640 acres within two days, it felt bound to follow the explicit agreement that the land was surveyed on January 19 and 20, 1883, and that the surveyor surveyed the lands in tracts of 640 acres each.  In discussing the rights of the applicant, the Court says:

"In so far as mere property rights are concerned we see no difference between the contract of a State and an individual and a contract between two individuals.  The formalities by which they are entered into may different, but the principles affecting the two are essentially the same.  When there is an offer made by an act of the Legislature which is accepted by an individual there is a contract, which it is not within the power of the State to impair. After an acceptance a repeal of the law cannot affect the contracts, but until an acceptance a repeal of the act withdraws the offer and no contract can be made. By the Act of July 14, 1879, the State offered to sell the land to any responsible person who would make application for it and cause it to be surveyed. The

Hon. Bascom Giles, March 20, 1939, Page 12

appellees had accepted the terms by making application andprocuring the surveys before the act was repealed. The contract was complete and could not be impaired by the subsequent legislation which repealed the act. The expenses of the surveys, in connection with the price to be paid to perfect the title, are a sufficient consideration to support the contract. It cannot be treated as a mere bounty or gratuity on part of the State."

In Harper v. Terrell, 96 Tex. 479, 73 S. W. 49, the Court in discussing the sale under the Act of 1879 used this language:

"The conditions precedent to the power to sell having been thus complied with, and the purchaser by his application having accepted the offer to sell thus held out by the statute through such action of the Commissioner, andhaving complied with the statutory requirements, there was a complete executory contract of sale."

In Creamer v. Briscoe, 101 Tex. 490, 109 S. W. 911, the Court had under consideration the question of the rights acquired under the Homestead Donation Act and held that since the rights accrued when the first step was completed, the property was the community property of the husband and his first wife. The Court said:

"It is not correct to say that a husband and wife who have settled upon public lands under the law giving them the right to occupy and improve it and eventually to obtain title by such occupancy and improvement, acquire no right prior to the running of the prescirbed time. It is true that they do not acquire a complete title, legal or equitable, until they have possessed for such time, but it does not follow that they do not acquire a right in the land which afterwards merges in and determines the character of the title. From the time of the initial steps, the settlement, they have the right to hold and use the land as owners against any one but the State, and against the State at least so long as they comply with the law and it remains unchanged."

In Pohle v. Robertson, 102 Tex. 274, 115 S. W. 1166, the Court upheld the right of an applicant to purchase school land even though he had not complied with the statutory requirement to gain title and that he had

a superior right against a subsequent purchaser. The Court says:

> "The sale to plaintiff took the land off the market and afterwards the Commissioner could not sell and the defendants could not buy it. The superior title remained in the State, while the right vested in the plaintiff to acquire that title by complying with the statutory conditions." ****

> "The legal efficacy of a purchase of school land comes from the law which gives effect to the taking of the steps by which it authorizes the acquisitions of title, and not from the consent of the officer to an application."

In Pence v. Robinson, 102 Tex. 489, 119 S. W. 1145, the court refused the Writ of Mandamus for the reason that it did not agree with the contention of relators that the right given by Section 8 of the Act of 1905 to an applicant who has caused unsurveyed land to be surveyed for the purpose of buying it within 60 days after the approval of the survey, was taken away by an Act of 1907 which provided that no one shall thereafter have any preference to purchase any unsurveyed land. The Court said:

> "The right given by the Act of 1905 is not a preference right in the sense of the provision just quoted. All persons are equally entitled by the former Act to take the steps therein authorized to acquire unsurveyed land, no preference being given to one over another. The beginning of those proceedings is not the exercise of a preference, but is the initial step necessary to a purchase., which anyone may take. What that step has been taken and has been followed by the others necessary to the purchase, the person who has conducted them is recognized as an applicant who has acquired the right to buy, not by virtue of a preference given to him for other reasons, but because he has complied with the conditions upon which he may purchase unsurveyed land, and the duration of that right is limited to sixty days in which it may be matured into a completed purchase. The right is not even called a preference in the statute. Laws in existence prior to 1907 did give preferences, so named in the statutes, and it was to such that the law of that year evidently refers."

In this connection, we call attention to Section 6 of the 1931 Act which does not give the applicant "a preference" right to purchase, while Section 8 does give the person "who discovers" the area a preference right. In either event, under the authorities quoted above, the right to purchase or lease is secured at the time of the filing of the application with the county surveyor, subject only to be cut off from the right at a subsequent stage for failure to comply with the law.

The sales Act of 1905 (Acts Regular Session 29th Legislature p. 159) is very similar to section 6, of the 1931 Act. Section 8 of the 1905 Act provides that any person desiring to purchase any portion of the unsurveyed school lands shall make written application to the surveyor of the proper county stating that he desires to have the land surveyed with the intention of buying it. The Act also provides that it shall be the duty of the surveyor to file and record the application and survey the land, and return the field notes to the Land Office within 90 days from the date of filing the application.

In Cox v. Robinson, 103 Tex. 354, 127 S. W. 806, the Court in discussing the effect of an application filed under the above mentioned Act stated as follows:

"If relator's field notes had been correct he would have acquired a right to purchase the land and the Commissioner could not have lawfully refused to place a valuation upon the land and do those things necessary to enable the applicant to complete his purchase. This was pa privilege granted to any applicant to purchase. Cox secured a preference to purchase by filing his application subject to the condition of the diligent prosecution of it prescribed by the Statute."

We see that the court in the above case construed the Act of 1905, which contains the same provisions as Section 6 of the 1931 Act, with reference to the filing and return of field notes, and clearly holds that the applicant secured a preference right to purchase by filing his application subject to the condition of the diligent prosecution of its as prescribed by the Statute. We can see no difference between the Act of 1905 and the Act of 1931 in this respect. If the right to purchase under the 1905 Act became vested upon the filing of the application, we see no reason why the right does not become vested upon the filing of the application under the 1931 Act.

Hon. Bascom Giles, March 20, 1939, Page 15

In Hooks v. Kirby, 124 S. W. 156, (Writ of Error Refused) and Wing v. Dunn, 127 S.W. 1101, (Writ of Error Refused), the Court discussed an act of 1901 which sought to impose additional conditions and burdens upon the right of purchasers under the act of 1895. In Hooks v. Kirby, the Court says:

"The law under which the timber was purchased from the state gave the absolute right to the purchaser to buy the land at any time within five years from the date of the sale of the timber to him, or at least until all the timber is removed. This right formed a part of the consideration paid for the timber, and entered into the contract as much as did the cash consideration of the $5 per acre which he paid. When he paid the cash and took a deed to the timber, the law wrote into the contract that he was also thereby granted the right to buy the land within a certain time for a certain further consideration, and this right became vested and cannot be impaired by subsequent legislation."

In Wing v. Dunn, the court says:

"Without stopping now to indicate in detail the rights a purchaser of timber under article 4218q acquired to thereafter purchase the land on which the timber stood, it is sufficient to say that such rights as were so acquired were contractual and vested, and could not be impaired or taken away by future legislation. If under the act of 1895 as amended in 1897, which entered into and formed a part of the contract of purchase of the timber, the owner of the timber and the right to purchase the land on the terms in said law provided, then his rights were not and could not be affected by the act of 1901, even though so intended by the Legislature."

In State v. Robinson, 119 Tex. 302, 30 S. W. (2) 292, the court passed upon the validity of an Act of the Legislature withdrawing all University lands from lease after the Land Commissioner advertised for bids for lease. The court held that where the bidder had filed his application with the Land Commissioner to lease certain tracts of land and had complied with the law in filing his bid, the bidder had accepted the offer of the State and the Legislature was without authority to deprive him of his

right to secure the lease if he should be the highest
bidder. In discussing the question involved, the court
says:

"If a contract of purchase or a right to
purchase an oil and gas lease on any tract of
land vested in any of the interveners under the
terms of said statute, that contract or that
right of course would be protected by the statute
and by the Constitutions of the United States and
of Texas."

* * *

"Through the Act the State informs the public
that it will sell to any person an oil and gas
lease on any of the University lands; and to the
end that a proper price may be had from a highest
bid, requires that the prospective purchaser
select the tract he wishes to buy. In order to
receive the highest price for the lease, and to
afford every person an equal opportunity to
purchase, the Act requires that advertisement be
made that on a certain fixed date an oil and gas
lease on that tract will be awarded."

* * *

"As first stated, the Act makes an offer to sell
the leases. Like other similar Acts, it may be de-
signated as 'offer' law. The law stipulates the
terms of the contract, and its provisions are sub-
ject to the same or similar construction as the
provisions of contracts between individuals."

* * *

"An act of the Legislature made the offer,
and interveners have accepted it as provided and
conditioned in the Act. A contract between the
State and the highest bidder was made."

In Caples v. Cole, 129 Tex. 370, 102 S. W. (2d)
173, the Supreme Court recognized the vested right of appli-
cants under the 1931 Act by saying:

"The record shows that a patent was issued
to Cole on August 19, 1931, and that within one
year thereafter Caples filed his application to

purchase, or in the alternative, to lease the land for oil and gas purposes. This gave him an interest in the land in controversy under the terms of this law."

In Stanolind Oil & Gas Company v. State, 114 S. W. (2) 699 (Writ of Error Granted and cause submitted in the Supreme Court on oral argument January 25, 1939), one of the questions before the Court was whether Tyler, who was the original discoverer of an alleged vacancy, but who did not file an application to lease until after other applications had been filed, had a right over prior applicants to secure a lease. In the original opinion by the court, it seems clear that the court intended to hold that the first one taking the steps provided by the statute to bring the matter to the Land Office was entitled to the right to lease, but some parties took the court's opinion to mean that the first person to file with the Land Commissioner had the right to lease. The matter was made clear and definite by the court in its opinion on motion for rehearing at page 706 as follows:

"In some amicus curiae motion filed by attorneys representing clients in other pending cases, objection is made to the portion of our original opinion reading: 'The discovery alluded to in the 1931 Act we think clearly means the discovery by 'any person' to the land commissioner, by means of an application to lease under the 1931 Act.'

It is stated that this language is being construed as holding that the party who first files his application for purchase in the Land Office is entitled to priority over one who had made an earlier application for survey but had not filed his application to purchase until later. The quoted language was not intended to so hold, nor do we think it is fairly susceptible of that construction. The point under consideration was whether the party who first discovered the existence of a vacancy was entitled to priority regardless of the date of his application under the 1931 act. The thought embodied in the quotation is that the rights of a party under the act are fixed by means of compliance with the act. An application to purchase is, of course, essential. As prerequisite there to, a survey is necessary. The application for survey constitutes the first step under the act and no doubt fixes the rights of the applicant in so far as time is concerned. Failure or refusal to follow up the application for survey with such application to purchase would defeat the accrual of any rights under the application for survey."

In view of all of the above authorities we have

reached the conclusion that the provision of Section 2 of the 1939 Act exempting from withdrawal lands on which applications have been filed with the Land Commissioner is to be construed as exempting from withdrawal all lands on which applicant takes the initial step to purchase, or lease. By giving this construction, we are able to construe the 1939 Act so as to uphold its validity in its entirety. If, however, we are wrong in this construction, then we are of the opinion that the filing of an application for survey with the view of purchasing or leasing under Section 6 or Section 8 is the first step on the part of the applicant, and by taking this initial step, he secures a vested right to continue each step, as provided by the statute to purchase or lease the land involved. This rights, under all of the authorities above quoted, is a vested right of which the applicant cannot be deprived by the Legislature and, therefore, the 1939 Act does not affect this vested right.

In view of the above conclusions, your first question is answered in the negative. The second and third questions are answered in the affirmative. In answer to the fourth question, it is our opinion that the 1939 Act will not operate to prolong the existence of any right secured by the filing with the county surveyor of an application for a survey. We say this for the reason that in answer to the other questions propounded by you, we have held that the 1939 Act has no effect on pending applications filed with the county surveyor, and that the applicant has the right to take each successive step thereafter as provided by the statutes.

Unless you have field notes tendered to you for filing more than 120 days from the date of the application filed under Section 8 of the 1931 Act, it is again unnecessary for this Department to pass upon the question as to whether the field notes under an application filed under Section 8 of the 1931 Act must be filed within 120 days from the date of the application. This question will likely be decided in the case of Crighton v. State, No. 8758, now pending in the 3rd Court of Civil Appeals, (Submitted on oral argument Nov. 30, 1938). The statute is clear, however, that the field notes under an application to purchase under Section 6 must be returned to the Land Office within 120 days and the 1939 Act, therefore, would not have the effect of allowing field notes under Section 6 to be filed after 120 days from the date of

the application. We express no opinion as to whether field notes under Section 8 may be returned after 120 days, as we desire to await the decision in the above cause on that question.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By H. Grady Chandler
Assistant

HGC:BT

APPROVED:

(Signed) Gerald C. Mann

ATTORNEY GENERAL OF TEXAS